**FEDERAL INSURANCE COMPANY,**
**Plaintiff–Appellant,**

v.

**The FIFTH THIRD BANK,**
**Defendant–Appellee.**

No. 87–4132.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 6, 1988.

Decided Feb. 13, 1989.

John J. Petro (argued), J. Paul McNamara, McNamara & McNamara, Dennis D. Liston, Columbus, Ohio, for plaintiff-appellant.

Sylvan Reisenfeld (argued), Reisenfeld & Associates, Cincinnati, Ohio, for defendant-appellee.

Before MERRITT and GUY, Circuit Judges, and EDWARDS, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

Federal Insurance Company (Federal) brought this diversity action against the Fifth Third Bank (Bank) seeking a judgment in the amount of $766,815.45. Federal, as surety on a bond for Becker Electric Company (Becker), alleged that the Bank wrongfully offset two Becker deposits which were the proceeds of progress payments made to Becker involving a contract

with the State of Ohio on which Federal was the surety. The district court held that Federal had not shown the existence of any type of trust, assignment, or subrogation which would have legally or equitably prohibited the Bank from offsetting these deposits against sums owed to the Bank by Becker in connection with prior loans. Federal subsequently filed this appeal, asserting that the district court erred in not finding either that there was a trust created or that Federal had equitable rights in the deposits superior to the Bank's offset rights.

Upon review, we conclude that an express trust was formed by the contract between Becker and the State. Since Ohio follows the "equitable rule" on the issue of whether the Bank could offset money in Becker's account which Becker held in trust, the Bank was precluded from offsetting the deposits representing progress payments. Federal, subrogated to the rights of the subcontractors who were the beneficiaries of the money Becker held in trust, is therefore entitled to the two deposits. The judgment of the district court is reversed and remanded with instructions to enter judgment in favor of Federal.

## I.

In early 1985, Becker Electric Company entered into an agreement with the State of Ohio to perform a contract at the Chillicothe Correctional Institution. According to the terms of the contract, Becker was required to post a performance bond. Federal, as surety, provided a performance bond in accordance with the "General Agreement of Indemnity." Becker then performed some of the work under this contract with the State.

At the time of entering into this contract, Becker had outstanding loans owing to the Bank which were unrelated to the Chillicothe project. These loans were renewed by the Bank in December of 1985, in amounts of $400,000 and $800,000. At the time of renewal, Robert Murray, president of Becker, signed a personal guarantee on these loans.

The promissory notes for each loan contained the following condition:

Events of default: this obligation ... shall become immediately due and payable at the option of the holder ... upon the occurrence of any of the following described events;

. . . .

5) In the judgment of the holder, any adverse change occurs in the ability of the undersigned to repay this debt or the holder deems itself insecure.

Prior to March of 1986, Becker and the Bank agreed that a forthcoming IRS refund check for $354,545 would be applied to the outstanding loan balance. Despite the agreement, Becker failed to notify the Bank when the refund check was received. The Bank then demanded deposit of the check, and Becker did deposit the check on March 14, 1986. The Bank then concluded that there had been an "adverse change" and that it was "insecure" and accordingly declared the loans immediately due and payable. Between March 14 and April 23, the Bank offset approximately twelve of Becker's deposits resulting in a full repayment of the notes and a release of Mr. Murray's personal guarantee.

Two of the deposits that were credited to the loan repayments represented progress payments made by the State on the Chillicothe project. The sum of these two deposits is what Federal is suing the Bank for in this action. Becker requested the first progress payment for $632,670.32 in early March 1986. The State required Becker to submit a "Mechanics Lien Affidavit" with the request. Becker supplied the affidavit but only listed five suppliers under the heading "material men," and did not list any amounts which were due these suppliers. The State issued the progress payment, and Becker, upon receiving the check, deposited it into the escrow account of Becker's attorney. From that account there was withdrawn $100,000 payable to Robert Murray and $12,000 payable to Becker's attorney for legal services. The balance, $520,294.45, was subsequently deposited in Becker's account at the Bank,

and immediately taken by the Bank to offset the loans.

The second progress payment, for $246,521, was deposited at the Bank on April 23, 1986, and was also used as a setoff against the outstanding loan balance. Prior to the second setoff, on April 15, 1986, Becker had advised all creditors that it was ceasing operations. Federal, as the surety on the performance bond, was given notice by the State on April 16, 1986, to complete Becker's contractual obligations to the State. Federal completed Becker's contract and ultimately sustained a net loss of $1,100,000. This loss included payment to those suppliers who were listed in the Becker affidavit to the State on March 20, 1986, and had not been paid from that first progress payment.

Federal subsequently brought an action against the Bank to recover the amounts of the two progress payments deposited and then offset by the Bank. The district court judge, after a bench trial, issued findings of fact and conclusions of law. The district court held that there was no trust, assignment, or subrogation theory as asserted by Federal by which Federal could recover from the Bank.

## II.

■ Federal's first issue on appeal is that the district court erred in not finding that the contract between the State and Becker created an express trust and therefore Federal could proceed against the Bank for wrongfully offsetting alleged trust funds.

Federal made these same express trust arguments before the district court. The district court, under Fed.R.Civ.P. 52(a), made both factual findings and conclusions of law. In *Taylor & Gaskin, Inc. v. Chris–Craft Industries*, 732 F.2d 1273 (6th Cir.1984), we set forth the applicable standards of review of a lower court's findings. We explained that factual findings must be upheld unless clearly erroneous. *Id.* at 1277. However, "[t]his court may review *de novo* findings of ultimate facts which result from the application of legal principles to subsidiary factual determinations;

moreover, conclusions of law are excluded from the clearly erroneous standard of Rule 52(a), and are therefore also subject to the *de novo* review of this court." *Id.* (citation omitted). Here, Federal is appealing the district court's conclusions of law, which we will give *de novo* review, but we will credit all factual findings found not to be clearly erroneous.

Federal claims that Section 17(i) of the contract between Becker and the State created an express trust. This section states:

All monies paid on account to any contractor for materials or labor *shall be regarded as fund [sic] in his trust for payment of any and all obligations relating to this contract* and no such amount of monies shall be permitted to accrue to the contractor until all such obligations are satisfied. Evidence satisfactory to the state may be required to show that all current obligations relating to this work are satisfied before releasing any payment due on the work. Before payment of the final estimate, each contractor shall file an affidavit with the state, stating that monetary oblications [sic] relating to lienable items in connection with the work have been fulfilled.

(Emphasis added).

Federal asserts that in this contractual provision, Becker agreed to· hold as trustee any progress payments that were received from the State. The progress payments were therefore "trust funds," the State was the "settlor" of the trust, and the job creditors were the beneficiaries of the trust.

It is undisputed that Federal is subrogated to the rights of the job creditors. *Western Casualty and Surety Co. v. Brooks*, 362 F.2d 486, 490 (4th Cir.1966) (applying Ohio law); *Ohio ex rel. Star Supply v. City of Greenfield*, 528 F.Supp. 955, 958–59 (S.D.Ohio 1981). Federal's obligation under the bond arose when Becker abandoned the Chillicothe project. Federal then completed the project and paid all of Becker's job creditors. Upon payment, Federal received an assignment from the job creditors of their rights against Becker. However, Federal, as surety, cannot obtain any

greater rights than the job creditors had at the time Federal acquired their rights. *Western Casualty and Surety Co.,* 362 F.2d at 491. Therefore, only if the job creditors would have had a cause of action under the contract between Becker and the State for the alleged "trust funds" would Federal now have that claim by subrogation or assignment. *See American Fidelity Co. v. National City Bank,* 266 F.2d 910, 914–15 (D.C.Cir.1959).

Therefore, the essential issue is whether a trust was created by this contract provision. The district court examined the proposition that either the affidavit submitted by Becker to the State to obtain the first progress payment, or the contract itself created an express trust. However, the district court proceeded from the initial assumption that the Bank would be the trustee. Since the district court found no evidence that the Bank had agreed to be a trustee of these funds for the benefit of the job creditors, the court concluded that there was no trust formed. We agree with Federal, however, that the correct analysis asks whether a trust was formed with Becker as the trustee. Federal, in this appeal, does not argue that the affidavit evidenced a trust, but instead confines its argument to the contract provision as evidence of a trust.

Under Ohio law the existence of a trust and the manifestation of an intention to create the trust must be demonstrated by clear and convincing evidence. *Hill v. Irons,* 160 Ohio St. 21, 29, 113 N.E.2d 243, 248 (1953). In *Guardian Trust Co. v. Kir-*

*by,* 50 Ohio App. 539, 199 N.E. 81 (1935), an Ohio court stated:

> It is a well-settled principle of law in this and other jurisdictions that if one person pays money to another it depends upon the manifested intention of the parties whether a trust or a debt is created. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor, or a third person, a trust is created. If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created. The intention of the parties will be ascertained by a consideration of their words and conduct in the light, of surrounding circumstances.

50 Ohio App. at 543, 199 N.E. at 83.

We must therefore look to the surrounding circumstances to determine whether the State intended to create a trust.[1] Here, the State, as owner of the Chillicothe project, had an interest in insuring that job creditors were paid so that the project would proceed uninterrupted. If the job creditors were not paid by Becker, they could proceed against the State for unpaid amounts which were retained by the State.[2] *See Ohio ex rel. Star Supply v. City of Greenfield,* 528 F.Supp. at 959. In the typical situation where the owner pays progress payments to a contractor unencumbered by a trust, the payments are the property of the contractor, and job creditors cannot assert an interest in the payments. *Fidelity & Deposit Co. v. Scott*

---

**1.** *See* RESTATEMENT (SECOND) OF TRUSTS § 25 and comment b (1959):

> No trust is created unless the settlor manifests an intention to impose enforceable duties.

Comment:

. . . .

> b. . . . In determining the intention of the settlor the following circumstances among others are considered: (1) the imperative or precatory character of the words used; (2) the definiteness or indefiniteness of the property; (3) the definiteness or indefiniteness of the beneficiaries or of the extent of their interests; (4) the relations between the parties; (5) the financial situation of the parties; (6) the mo-

tives which may reasonably be supposed to have influenced the settlor in making the disposition; (7) whether the result reached by construing the transaction as a trust or not a trust would be such as a person in the situation of the settlor would naturally desire to produce.

**2.** In Ohio, job creditors can assert direct rights to state project funds only by following mechanic's lien requirements as prescribed in OHIO REV.CODE ANN. §§ 1311.26–.32. This mechanic's lien can apply only to funds retained by the State and therefore has no application to progress payments given unencumbered to the general contractor.

*Bros. Constr Co.*, 461 F.2d 640 (5th Cir. 1972); *American Casualty Co. v. Line Materials Indus.*, 332 F.2d 393 (10th Cir. 1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 646, 13 L.Ed.2d 555 (1965); *Kane v. First Nat'l Bank*, 56 F.2d 534 (5th Cir.), *cert. denied*, 287 U.S. 603, 53 S.Ct. 8, 77 L.Ed. 524 (1932).

In contrast to these "typical" cases cited, the parties here have included the contract provision which refers to Becker's holding the payments "in trust." The State knew that progress payments that it would make to Becker would represent amounts Becker would owe to laborers, material men, and subcontractors. The State asked, and Becker agreed, to hold the progress payments in trust for the job creditors. The State apparently gave the job creditors this interest in the progress payments to protect the State's interest in having the project expeditiously completed. Although the State also required a bond to protect itself in the event of a default by Becker on the entire project, the requirement of the "trust," by which Becker had to first pay job contractors out of money received, also furthered the State's interests by deterring any work stoppages by unpaid job creditors. The contract provision also demonstrates that the State intended to impose enforceable duties upon Becker, and this factor also tends toward the conclusion that a trust was formed. The State mandated that it could withhold further payments to Becker if Becker did not satisfy all "current obligations" relating to the work. The posting of the performance bond by Becker was another enforceable duty to protect the interests of the State and the job creditors.

The Bank argues that, under the *Guardian Trust* analysis, the contract provision evidenced a "debt" by Becker to the job creditors, and not a trust. The Bank asserts that the intention of the State and Becker was that Becker should have the unrestricted use of the payments, and that Becker was merely liable to pay a similar amount to the job creditors. However, this argument ignores the plain wording of the contract. This contract did not give Becker unrestricted use of the money but, instead, ordered Becker to pay all obligations relating to the contract out of the progress payment prior to allowing any amounts to accrue to Becker. The Bank also argues that there was not a trust formed because there is no evidence in the contract that the State required Becker to hold this money in a separate account. However, this is not a determining factor of whether a trust was formed. The requirement to hold the funds in a separate account is a fiduciary obligation of Becker's, as trustee, and therefore, when a trust is formed, the trustee has this obligation regardless of the trust agreement wording. *See* RESTATEMENT (SECOND) OF TRUSTS § 179 (1959).

In summary, we hold that an express trust was formed by the contract provision, with the State as settlor, Becker as trustee, the job creditors as beneficiaries, and the progress payments as trust funds. An examination of both the non-precatory language of the contract, and the relationship between the parties, evidences the intent to create a trust, and Becker's agreement to act as trustee.

### III.

■ Having decided that an express trust was formed by the contract does not end our inquiry, for we need to address the issue of whether Federal can recover these "trust funds" from the Bank.

As previously mentioned, the Bank used these progress payment deposits to offset Becker's outstanding loans which were unrelated to the Chillicothe project. A bank has a common law right of setoff; it can apply deposits belonging to the depositor to the pre-existing indebtedness of the depositor. *See Kopp Clay Co. v. State ex rel. Fulton*, 125 Ohio St. 512, 182 N.E. 494 (1932). However, a bank does not have an automatic right of setoff when the funds are held by the depositor in a fiduciary capacity, and, here, we have concluded that Becker held these funds in a fiduciary capacity for the job creditors.

The majority rule is that where a bank has no knowledge of the interest of a third

party in an account, it may set off any obligations owed by the party in whose name the account is entered. However, Ohio follows the minority rule, also termed the "equitable rule," which states that:

"A Bank, even though it has no knowledge, either express or implied, that another than the depositor has an interest in the funds deposited in his own name, can not apply such funds to the individual indebtedness to it of the depositor, where such lack of knowledge has not resulted in any change in the Bank's position and no superior equities have been raised in its favor."

*Kull v. North High Sav. & Loan Co.*, 21 Ohio Law Abs. 172, 176 (Ohio Ct.App.1935) (citation omitted).

In *Kull,* plaintiff allowed her money to be deposited into the account of a third party. The defendant bank used the deposit to offset the personal indebtedness of the third party. The court held that the bank, even though it had no knowledge of the plaintiff's interest in the deposit, was not justified in exercising this setoff unless it could introduce evidence that it had changed its position in reliance on the deposit. *Id.*

The Bank offers no authority to negate the presumption that Ohio continues to follow this "equitable rule." The Bank argues that it was entitled to exercise setoff here, as supported by *Kopp Clay.* In this case, Kopp Clay loaned a building company $2,800 to be used in meeting the building company's payroll. The building company deposited the check into this general account at the bank, and the bank used this deposit to set off a preexisting debt that the building company owed. The court found for the bank because the money was a "loan" and therefore belonged to the depositor. The court stated that "[t]he case, hence, is entirely differentiated from cases where money or other property is delivered to a person in trust, to be by him paid or delivered over for the benefit of a third person." *Kopp Clay Co.*, 125 Ohio St. at 515–16, 182 N.E. at 495. The Bank's argument that *Kopp Clay* applies therefore fails because we have determined that

Becker held the progress payments in trust.

There are few Ohio cases subsequent to *Kull* which discuss Ohio's "equitable rule" concerning setoff, but these few cases are in accord with *Kull*. *Fayen v. Cleveland Trust Co.*, 23 Ohio Op. 563 (1942); *In re Triple A Coal Co.*, 55 B.R. 806 (S.D.Ohio 1985). Therefore, even if the Bank did not know that Becker held these progress payments in trust for the job creditors, the Bank could not offset the two deposits unless it changed its position in reliance on these deposits.

The Bank did not present any evidence at trial that it changed its position in reliance on the deposits. However, the evidence introduced at trial delineated the close working relationship that existed between Becker and the Bank. George Schaffer, a Bank executive, testified that the Bank's goal was to "get as much principal and interest back as the bank could." The Bank advanced Becker additional funds totalling approximately $220,000 on March 23 and 27, 1986, to enable Becker to pay an insurance premium and to meet some payroll accounts. This was at a time period when the Bank had previously declared Becker in default of $1.2 million in loans. There was also testimony that Robert Murray, Becker's attorney, and the Bank met several times during March and April of 1986, and that Becker functioned only with authorization from the Bank prior to any transaction.

There was no evidence developed at trial on the issue of whether the Bank had actual knowledge that Becker was to hold these payments "in trust" for the job creditors. However, because of the evidence that was developed as to the close working relationship between Becker and the Bank, the Bank probably had actual knowledge but was at least charged with inquiry notice to determine the true character of the progress payments. *See In re Tonyan Constr. Co.*, 28 B.R. 714 (N.D.Ill.1983). Mr. Schaffer testified that prior to the April 8, 1986, deposit, the Bank knew that Becker was expecting this payment from the State, that it represented a progress

payment on the Chillicothe project, that Becker owed job creditors, and that Becker had signed an affidavit to get the money. Therefore, even if the Bank had argued that it changed its position in reliance on these progress payments, the Bank would still not prevail because either the Bank had actual knowledge or at least should have inquired as to the true nature of these payments, and consequently was not reasonable in relying on these progress payments to change its position. *See American Nat'l Bank v. National Indem. Co.,* 222 F.2d 513, 519 (8th Cir.1955).

### IV.

Having found for Federal on its first issue on appeal, we need not reach Federal's alternative issues.

The judgment of the district court is REVERSED and REMANDED with instructions to enter judgment consistent with this opinion.