**In re MARRS–WINN COMPANY, INC., Debtor.**

**MARRS–WINN COMPANY, INC., and J.S. Alberici Construction Company, Inc., Plaintiffs/Appellees,**

v.

**GIBERSON ELECTRIC, INC., Defendant/Appellant.**

**No. 95–3108.**

United States District Court, C.D. Illinois, Springfield Division.

March 11, 1996.

John L. Greenleaf, Jr., Decatur, IL, A. Thomas DeWoskin, St. Louis, MO, Michael E. Wilson, St. Louis, MO, for plaintiffs/appellees.

James E. Peckert, A. James Shafter, Mark D. Gibson, Decatur, IL, for defendant/appellant.

## OPINION

RICHARD MILLS, District Judge:

Bankruptcy appeal.

In short, the bankruptcy judge is affirmed.

## I. BACKGROUND

### A. *Facts*[1]

This case arises out of the construction of St. Louis, Missouri's new domed football stadium, now known as the TransWorld Dome.

Plaintiff/Appellee J.S. Alberici Construction Co., Inc. (Alberici) was the general contractor for the stadium construction project, and Plaintiff/Appellee Marrs–Winn Co., Inc. (Marrs–Winn)—the debtor—was a subcontractor on the stadium project. Defendant/Appellant Giberson Electric, Inc. made a business loan to Marrs–Winn to enable Marrs–Winn to comply with the conditions of its subcontract with Alberici.

On May 18, 1993, Alberici informed Marrs–Winn that it intended to award Marrs–Winn the subcontract to install reinforcing steel and post tensioning cable on the stadium project. In exchange for the work to be done, Alberici stated that it would pay $6,896,900, a price based on Marrs–Winn's bid and the requirement that Marrs–Winn furnish payment and performance bonds.

Marrs–Winn was unable to satisfy the bonding requirements set forth in the subcontract and was unable to contract with union ironworkers needed to do the job. On June 11, 1993, Alberici informed Marrs–Winn that it would withhold its signature on the subcontract until it received adequate bonds. Alberici subsequently stated that Marrs–Winn's failure to obtain proper bonds meant that Alberici would have to begin the reinforcing work itself and charge Marrs–Winn for the expense of doing so. On June 21, 1993, Alberici began the reinforcing work, and eventually "backcharged" Marrs–Winn $296,724.25 for the work it did.

On August 9, 1993, Marrs–Winn finally obtained suitable guarantees to satisfy Alber-

ici. Alberici and Marrs–Winn added "Exhibit G" to the subcontract. Exhibit G required Marrs–Winn to post a $100,000 letter of credit in favor of Alberici and established a special account to facilitate payment of Marrs–Winn's payroll expenses.

On August 10, 1993, Marrs–Winn filed a petition in Bankruptcy under Chapter 11 of the Bankruptcy Code. To meet its obligation under Exhibit G and to begin work on the St. Louis Stadium project, Marrs–Winn entered into a Business Loan and Security Agreement (BLSA) with Giberson. The BLSA, dated August 19, 1993, required Giberson to post the $100,000.00 letter of credit required by Exhibit G and provided for Giberson to advance up to $150,000.00 to Marrs–Winn.

Giberson and Marrs–Winn presented the BLSA to the bankruptcy court for approval. They represented that the agreement was essential to Marrs–Winn's ability to perform the subcontract, completion of which would benefit all the creditors. The bankruptcy court approved the BLSA in an Order Authorizing Debtor to Borrow Money, Grant Security Interest and Accord Priority Claim Status (the Financing Order). The Financing Order granted Giberson a first priority security interest in:

> [A]ll of the personal property of the Debtor that is presently existing, hereafter created or acquired by it or its estate or in which Debtor or its estate hereafter acquires any interest, wheresoever such property may be situated, including, without limitation, the following: All inventory of every kind and description, whether raw materials, work in process or finished goods, and all materials used or useable for the processing packaging or shipping of inventory; all accounts, accounts receivable, contracts (specifically including the Stadium contact), contract rights, and general intangibles; all documents, instruments and chattel paper; all returned, rejected and repossessed goods; all machinery, equipment, fixtures, furniture and motor vehicles; and all cash and non-cash

1. This statement of facts is a summary of the statement contained in the opinion of the bankruptcy court.

proceeds of the foregoing items, including insurance proceeds. . . .

On August 18, 1993, Alberici received the $100,000 letter of credit from Giberson. A week later, Alberici received Marrs–Winn's certificate of insurance, and on August 27, 1993, Alberici signed the subcontract. By the end of August Marrs–Winn had contracted with union ironworkers and by September 1, 1993, Marrs–Winn began work on the stadium project.

On August 17, 1993, a bank account was opened at Magna Bank of Illinois, under the name "Marrs–Winn Co., Inc., Debtor–in–Possession" (Magna Account). Payments from Alberici, under the subcontract, were to be deposited in the account.[2] The Loan agreement prohibited withdrawals from the account except with the signatures of Marrs–Winn and Giberson. Pursuant to a bank resolution, only Marrs–Winn's president was permitted to transfer funds.

On December 1, 1993, the balance of the Magna Account was approximately $20,000. On that day, Alberici approved two transfers to the account. The first was a payroll-related transfer of $79,610.67 and the second was a progress payment of $112,452.61.

On December 1, 1993, Giberson transferred $112,452.61 from the Marrs–Winn account to its own account. On December 3, 1993 Giberson again transferred funds from the Marrs–Winn account, this time $99,000.

On January 4, 1994, Marrs–Winn and Alberici filed a complaint in the bankruptcy court, seeking to force Giberson to return the funds it had transferred out of the Marrs–Winn account at Magna bank. On January 25, 1994, Giberson filed a motion seeking the bankruptcy court's approval of its application of the funds in the Marrs–Winn account to

its debt. As the bankruptcy court noted, Giberson made these transfers without Marrs–Winn's permission or signature.

## B. *Decision Below*

The bankruptcy court made several findings regarding Giberson's withdrawal of funds from the Magna Account. First, the bankruptcy court found that the withdrawal violated the loan agreement, which provides that withdrawals from the account were to be made "only pursuant to the signature of Marrs–Winn and Giberson."

Second, the bankruptcy court found that Giberson's withdrawal also violated the automatic stay imposed by 11 U.S.C. § 362. The bankruptcy court found that by taking possession of the funds Giberson violated the stay because it was not authorized by the Financing Order to seize the funds. Specifically, the bankruptcy court found that Giberson lacked authority to unilaterally decide to apply the funds in the Magna Account to its own debt.

After making these preliminary findings, the bankruptcy court evaluated whether Giberson had a right to the funds it had withdrawn. The bankruptcy court rejected Giberson's claim that the BLSA and the Financing Order entitled it to the money Alberici placed in the Magna Account. The bankruptcy court acknowledged that the Financing Order granted Giberson a first priority security interest in all of Marrs–Winn's property and that the Order authorized Giberson to receive and apply post-Chapter 11 accounts receivable and to withdraw remittances from lock boxes. Notwithstanding these provisions of the financing order, the bankruptcy court concluded that because the withdrawn funds were

---

2. The BLSA specifically provided:

   5.4 MARRS–WINN covenants and agrees that it shall establish, and execute any further documentation to effectuate, a joint account at Magna Bank located in Decatur, Illinois, or a likewise institution acceptable to GIBERSON, into which account all payments made pursuant to the subcontract to MARRS–WINN shall be placed. The parties hereto understand and agree that certain payments are being made by J.S. Alberici Construction Co., Inc. pursuant to the subcontract directly to future creditors of

   MARRS–WINN, including payroll, and such payments will not be placed in the bank account described herein.

   5.5 All funds placed within the account at Magna (or other acceptable institution) shall be withdrawn only pursuant to the signature of MARRS–WIN and GIBERSON. MARRS–WINN expressly agrees to execute any and all documents required by GIBERSON to obtain sole possession of funds in satisfaction of obligations or liabilities of MARRS–WINN described herein.

trust funds to which Marrs–Winn had only bare legal title, they were not part of the bankruptcy estate and not subject to Giberson's security interest.

The bankruptcy court also rejected Giberson's arguments that the BLSA and the Financing Order gave Giberson the right to withdraw the funds. The bankruptcy court concluded that if the various documents were in conflict, the Alberici subcontract controlled because it pre-dated the BLSA and the Financing Order and because the purpose of the BLSA and Financing Order were to allow Marrs–Winn to perform the Subcontract. The Court found, however, that no conflict existed between the documents because it construed the security interest granted to apply only to collateral, including accounts, in which Marrs–Winn had equitable interests. Because the funds in the Magna account were trust funds in which Marrs–Winn had no equitable interest, the bankruptcy court found that the security interest granted to Giberson did not attach to them.

### C. *Issues on Appeal*

On appeal, Giberson makes a variety of arguments for why this Court should reverse, or alter, the judgment of the bankruptcy court. Giberson raises the following issues:

1. Whether the United States Bankruptcy Court erred in denying the effect of its prior order which granted to the Defendant/Appellant the right to accept funds paid to the Debtor/Plaintiff/Appellee, and further whether said court erred in rejecting the terms of said order.

2. Whether the United States Bankruptcy Court erred in its finding that a Subcontract entered into by and between the Plaintiff/Appellees, constituted a valid trust agreement when the funds were not designated as trust funds and when the funds were placed into undesignated bank accounts or cash equivalents.

3. Whether the Untied [sic] States Bankruptcy court erred in determining that the aforementioned Subcontract should take priority over a Business Loan and Security Agreement entered into by the Debtor/Plaintiff/Appellee and the Defen-

dant/Appellant, and further erred in ignoring the effects of the prior order entered by said court.

4. Whether the United States Bankruptcy Court erred in its interpretation of the aforementioned Business Loan and Security Agreement, and whether said court erred in awarding a judgment without taking into account $100,000 previously paid by the Defendant/Appellant and received by the Plaintiffs/Appellees.

5. Whether the United States Bankruptcy Court erred in providing for payment to the Plaintiff/Appellee of funds which would constitute a preferential payment for pre-bankruptcy debt, and whether said court erred in denying the Defendant/Appellant's Motion for Order Approving Application of Funds and Provision of Priority Interest.

### II. STANDARD OF REVIEW

Under Bankruptcy Rule 8013, "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R.Bankr.P. 8013. Legal conclusions made by the bankruptcy court are subject to de novo review. The facts in this case are uncontested and the bankruptcy court's decision rested solely on legal conclusions.

Pursuant to Bankruptcy Rule 8012, the Court concludes that oral argument would not be helpful. Specifically, "the facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument." Fed.R.Bankr.P. 8012.

### III. ANALYSIS

A. *Giberson Was Not Denied the Benefit of the Financing Order*

■ Much of Giberson's brief on appeal is devoted to the question of whether Giberson was denied the effect of the Financing Order. Giberson relies on *Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990) to argue that a creditor must

be able to rely on the terms of a financing order. In *Kham & Nate's,* the Seventh Circuit held that a bankruptcy court could not "undo the priority granted by a financing order without first finding that the creditor acted in bad faith." *Id.* at 1355. The reason for this is that 11 U.S.C. § 364(e) "instantiates the principle that bankruptcy judges may make binding commitments to give priority to new credit." *Id.* Thus, even if the bankruptcy judge is wrong on the law or the facts when he or she grants a high priority to new credit, that priority stands, absent bad faith by the creditor in obtaining it.

■ The Court wholeheartedly agrees that a creditor must be able to rely on a financing order. But the Financing Order, the BLSA, and the Subcontract all lead to the conclusion that Giberson was not entitled to the funds it withdrew from the Magna account. As will be discussed below, the funds in the Magna Account were trust funds, held by Marrs–Winn pursuant to an express trust. These funds came into the Marrs–Winn's bankrupt estate subject to the claims of the trust beneficiaries. Therefore, if Giberson had a security interest in the funds in the Magna account, that interest was subject to the trust imposed by the Alberici subcontract. Neither Giberson through the BLSA nor the bankruptcy court through the Financing Order could divest the beneficiaries of their equitable interests in the funds without giving prior notice and an opportunity to respond to the beneficiaries. Thus, requiring Giberson to give back the money it took from the Magna Account, so that the money could be distributed to the beneficiaries of the trust, did not deny Giberson the benefit of the Financing Order.

### B. *The Funds in the Magna Account Were Held Pursuant to an Express Trust*

■ As the Bankruptcy court correctly concluded, the funds held in the Magna account were trust funds. As such, they came to the bankruptcy estate subject to the claims of the beneficiaries, and were not subject to the priority interest granted in the Financing Order. *See* 11 U.S.C. § 541(a)(1), *see also In re Mastercraft Metals, Inc.,* 114 B.R. 183, 187 (Bkrtcy.W.D.Mo.1990).

Although "all legal and equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), are part of the bankruptcy estate, § 541(d) excludes equitable interests in property in which the debtor holds only legal title. This exclusion of funds held in trust has prompted courts to hold, as the bankruptcy court did in this case, that funds held by subcontractors that are intended to be paid to materialmen and laborers are not subject to the claims of other creditors.

In some cases, involving joint bank accounts or jointly payable checks, courts have found the existence of trusts to be implied. In *T & B Scottdale Contractors, Inc. v. United States,* 866 F.2d 1372 (11th Cir.), *cert. denied sub nom. Ellenberg v. T & B Scottdale Contractors, Inc.,* 493 U.S. 846, 110 S.Ct. 139, 107 L.Ed.2d 98 (1989), the Eleventh Circuit held that funds deposited in an account jointly held by the contractor and subcontractor were not part of the bankruptcy estate because the funds were clearly held for the subcontractor's materialmen. *Id.* at 1376. Judge Hatchett dissented, arguing that *Georgia Pacific Corp. v. Sigma Service Corp.,* 712 F.2d 962 (5th Cir.1983), controlled. *Georgia Pacific* involved a debtor/subcontractor who requested that checks from the contractor be drawn to the order of both the subcontractor and the materialmen. 712 F.2d at 964. The Fifth Circuit in *Georgia Pacific* found no trust. Judge Hatchett argued that in neither *Georgia Pacific* nor T & B Scottdale did the agreements impose affirmative obligations on the debtor to turn over the funds. The majority in *T & B Scottdale* distinguished *Georgia Pacific,* however, arguing that T & B and the general contractor had expressly agreed that the "funds were meant solely for the materialmen." 866 F.2d at 1372.

In other cases, courts have considered the effect of trusts imposed by law or express agreement. In *Universal Bonding Insurance Co. v. Gittens & Sprinkle Enterprises, Inc.,* 960 F.2d 366 (3d Cir.1992), the Third Circuit held that payments for work done on public contracts were held in trust by the contractor for the benefit of materialmen and laborers. The Third Circuit, after conclud-

ing that state law imposed a trust on the payments, held that the funds could only be distributed to the intended beneficiaries and not to a surety who feared that it would be forced to pay the materialmen and laborers because of the debtor's default. *Id.* at 372. The Court stated that the debtor's bankrupt estate

> obtains no greater ownership over the payments than [the debtor] itself would have acquired prior to the bankruptcy filing. [The debtor's] bankrupt estate may retain legal title over the trust, but the beneficiaries of the trust, (namely, the laborers and material men and the surety after satisfying the claims of the laborers and materialmen), may reclaim their equitable interests in the trust fund so created through bankruptcy court proceedings.

*Id.*

The Sixth Circuit has also considered this subject. In *Federal Insurance Co. v. Fifth Third Bank,* 867 F.2d 330 (6th Cir.1989), a surety alleged that it was entitled to payments that were derived from a contract between an electrical contractor and the state of Ohio. The contract between the electrical contractor and the state provided that "[a]ll monies paid on account to any contractor for material or labor shall be regarded as a fund [sic] in his trust for payment of any and all obligations relating to this contract and no such amounts of monies shall be permitted to accrue to the contractor until all such obligations are satisfied." *Id.* at 332. The Sixth Circuit applied state law to conclude that the payments constituted a trust fund:

> In summary, we hold that an express trust was formed by the contract provision, with the State as settlor, [the contractor] as trustee, the job creditors as beneficiaries, and the progress payments as trust funds. An examination of both the non-precatory language of the contract, and the relationship between the parties, evidences the intent to create a trust, and [the contractor's] agreement to act as a trustee.

*Id.* at 334.

■ It is clear from these cases that a trust fund may be created in which payments from a contractor to a subcontractor consti-

tute the trust res. Attempting to avoid the impact of these cases, Giberson argues that the language of the Alberici subcontract is merely precatory. Giberson relies on *In the Matter of Lord's Inc.,* 356 F.2d 456 (7th Cir.1965), *cert. denied sub nom. Chicago Cutter-Karcher v. Maley,* 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966). In *Lord's* the Seventh Circuit rejected an argument that a trust existed, finding instead that the parties to the alleged trust were merely debtor and creditor. Of particular importance to the Seventh Circuit was a term of the purported trust agreement that allowed the funds allegedly held in trust could be commingled with the debtor's general funds. *Id.* at 457. Based on the contradictory terms of the agreement, which purported to impose a trust yet permitted commingling, and the conduct of the parties, the Seventh Circuit concluded that no trust existed. The circumstances of this case are different from those in *Lord's.* In this case, Alberici and Marrs–Winn did not enter a self-contradictory agreement. Instead, the Alberici subcontract clearly expresses both the intent to establish a trust and the terms of the trust. The facts of this case also support the conclusion that a trust was created. In this case, Alberici gave money to Marrs–Winn so Marrs–Winn could pay its materialmen and laborers. Without imposing limits on Marrs–Winn's ability to dispose of the money Alberici turned over, Alberici faced serious harm from the claims and liens of unpaid suppliers. The Court cannot say that the language of the Alberici subcontract was merely precatory.

■ The next question is whether the money in question *in this case* constituted a trust fund. In this case, the court need not look as much to facts and circumstances as to the express language of the subcontract to determine whether the funds in the Magna Account were held in trust. Under Missouri law, which the parties agree applies, an express trust exists when an agreement identifies "beneficiaries, trustees, a sufficiently described an identifiable trust res" and there is "an actual delivery of the trust corpus." *Electrical Workers, Local No. 1 Credit Union v. IBEW–NECA Holiday Trust Fund,*

583 S.W.2d 154, 161 (Mo.1979) (en banc). In this case, Section 2.5 of the Alberici subcontract identified beneficiaries ("those who furnished work, labor, materials, services, equipment, etc., to or through Subcontractor for the Subcontract Work."), a trustee (Marrs–Winn), and a trust res ("all funds received by Subcontractor from contractor"). When Alberici delivered the funds to the Magna Account, that satisfied the fourth element of an express trust (delivery of the trust corpus). As trust funds, the funds in the Magna account came to the bankruptcy estate subject to the claims of the beneficiaries. *Universal Bonding,* 960 F.2d at 372; *In re Mastercraft Metals,* 114 B.R. at 187.

### C. Giberson Was Not a Beneficiary of the Trust

■ Giberson argues that even if the funds in the Magna Account were trust funds, Giberson was a beneficiary of the trust. Giberson asserts that the BLSA provisions allowing it to receive fees of $400,-000.00 for consulting services provided to Marrs–Winn put Giberson on par with Marrs–Winn's materialmen and suppliers. The Court agrees with the bankruptcy court that this is a meritless argument.

The relevant provision of the Alberici subcontract, Section 2.5, provides that the tentative earnings are to be held "in Trust for the benefit of those furnishing work, labor, material, services, equipment, etc., to or through Subcontractor for the Subcontract Work." The Subcontract defined the contract work as "REINFORCING STEEL AND ACCESSORIES (MATERIAL AND INSTALLATION) AND POST TENSIONING AND ACCESSORIES (MATERIAL AND INSTALLATION) as required by the Contract Documents and as specifically described in the Specification Sections 03300 and 03340." Giberson's claim for consulting fees hardly seems to fit within these provisions. Further, as the bankruptcy court noted in its order, any request for payment of consulting fees was to be closely scrutinized, probably because of the exorbitant $400,000.00 amount of the proposed fee. Section 2.5 also clearly contemplates that the trust created was to be for the benefit of those who might have liens on the work Marrs–Winn did, and the reason for the imposition of a trust over the payments to Marrs–Winn was to ensure that those who might assert liens would be promptly paid.

### D. Other Provisions of the Financing Order

Giberson also claims that various provisions of the Financing Order entitled it to seize the funds in the Magna Account. The Court has already concluded that the bankruptcy court properly found the funds in the Magna Account to be trust funds exempt from Giberson's security interest. Because Giberson had no right to the funds, it is unnecessary to discuss whether various phrases in the financing order did or did not authorize Giberson to unilaterally seize funds from the Magna Account—even if Giberson could seize funds from that account, it could not properly seize funds that it did.

### E. The Impact of the $100,000.00 Letter of Credit

■ In a final attempt to justify its seizure of the funds in the Magna Account, Giberson claims that the bankruptcy court should have deducted the $100,000.00 already paid to Alberici under the letter of credit from the amount Giberson was required to return to the bankruptcy estate.

As part of the BLSA, Giberson agreed to post a $100,000.00 letter of credit for the benefit of Alberici. As a result of Marrs–Winn's default on the Alberici subcontract, Giberson had to pay the $100,000.00. In essence, what Giberson asks the Court to do is to partially ignore its finding that the money in the Magna Account was held in trust. Giberson thinks that because it lost out on the letter of credit, it should be allowed to keep part of the money it wrongfully seized. Giberson's argument makes no sense. It clashes with the result in cases like *Universal Bonding* where the Third Circuit noted, after finding that funds were held in trust for materialmen and laborers, that the surety could pursue the remedies of the laborers and materialmen by proceeding against the trust funds, but only after it paid the materialmen and laborers. 960 F.2d at

374–75. Similarly, in this case, Giberson must surrender all of the trust funds it seized.

## IV. CONCLUSION

Giberson entered into the BLSA in an attempt to help a struggling minority contractor perform a valuable subcontract. Giberson was aware of the terms of the subcontract when it entered into the BLSA. One of the terms of the subcontract was that proceeds tentatively earned by Marrs–Winn would be held in trust for Marrs–Winn's materialmen and laborers. Despite having a first priority security interest in Marrs–Winn's property, Giberson could not seize tentatively earned proceeds of the subcontract because Giberson was afraid that it would lose the money it lent to Marrs–Winn. Giberson's seizure was wrongful and the bankruptcy court properly set it aside.

*Ergo,* the Judgment of the United States Bankruptcy Court for the Central District of Illinois is AFFIRMED.