In re MARRS–WINN COMPANY,
INC., Debtor.

MARRS–WINN COMPANY, INC., J.S.
Alberici Construction Company,
Inc., Plaintiffs,

v.

GIBERSON ELECTRIC,
INC., Defendant.

Bankruptcy No. 93–71297.
Adversary No. 94–7001.

United States Bankruptcy Court,
C.D. Illinois.

Feb. 2, 1995.

---

John L. Greenleaf, Jr., Decatur, IL, for Debtor.

Mark D. Gibson, Decatur, IL, A. James Shafter, James E. Peckert, Decatur, IL, for Giberson.

A. Thomas DeWoskin, St. Louis, MO, for J.S. Alberici.

## OPINION

LARRY L. LESSEN, Bankruptcy Judge.

■ The issue before the Court is whether a creditor wrongfully seized funds in the Debtor-in-Possession's bank account. In resolving this issue, the Court must determine whether the funds were trust funds in which the Debtor held only bare legal title, or whether the funds were property of the estate and therefore subject to the creditor's security interest.

St. Louis has been without a professional football team since Mr. Bidwell picked up the St. Louis Cardinals seven years ago and moved them to Arizona. In order to attract a new football team, St. Louis is currently building a domed stadium. J.S. Alberici Construction Co., Inc. is the general contractor on the Stadium Project. As part of its contract on the project, Alberici is required to help out or "mentor" minority-owned businesses. The Debtor, Marrs–Winn, a minority-owned business, was one of the several bidders submitting bids to Alberici to furnish and install the reinforcing steel, the post tensioning cable, and related accessories for the Stadium Project. On May 18, 1993, Alberici informed the Debtor that it intended to award to the Debtor the Subcontract for the steel reinforcement work. The Subcontract price of $6,896,900 was based on the Debtor's bid price, which included $36,100 for the Debtor's cost to furnish the required payment and performance bonds.

The Debtor was initially unable to satisfy the requirements relating to the performance and payment bonds. The Debtor was also unable to contract with the local union ironworkers. In a letter dated June 11, 1993, Alberici informed the Debtor that Alberici had received the signed Subcontract from the Debtor but that Alberici was withholding its signature until it received the required payment and performance bonds. Alberici subsequently advised the Debtor that the failure to furnish the required bonds would prevent the Debtor from starting work on the scheduled June 17, 1993, start date. In a letter dated June 18, 1993, Alberici advised the Debtor that due to the lack of the required insurance coverage and bond protection, Alberici would start the on-site reinforcing

work on June 21, 1993, and "charge Marrs–Winn's Subcontract for the costs associated with this activity." Alberici did in fact begin the reinforcing steel work in late June, 1993, using ironworkers employed and paid by Alberici. Alberici later "backcharged" the Debtor $296,724.25 for the work performed by Alberici through August, 1993. Of this amount, $205,772.59 was incurred before August 10, 1993.

The Debtor continued to negotiate with Alberici over the summer on the subject of what would constitute an adequate bond, and this issue was finally resolved on August 9, 1993, by Exhibit G to the Subcontract. Subcontract Exhibit G requires that the Debtor post a $100,000 letter of credit in favor of Alberici as security for any default by the Debtor under the Subcontract. Exhibit G also set an agreed procedure for establishing and operating a special account to insure the payment of the Debtor's payroll related expenses for the project.

The Debtor filed its petition pursuant to Chapter 11 of the Bankruptcy Code on August 10, 1993.

The Debtor was able to provide the necessary letter of credit to Alberici through an agreement with Giberson Electric, Inc. This agreement was incorporated into a Business Loan and Security Agreement dated August 19, 1993. Pursuant to this Loan Agreement, Giberson agreed to loan or advance to the Debtor up to $150,000 in order to allow the Debtor to proceed with its performance under the Subcontract. In addition, Giberson agreed to post the $100,000 letter of credit required under Exhibit G. The Debtor and Giberson presented this agreement to the Court with the representations that the loan was necessary for the Debtor to complete the Subcontract, that the Subcontract was necessary to the continued viability of the Debtor, that time was of the essence, and that the completion of the Subcontract would result in a 100% payout to all creditors. Based on these representations, the Court approved the Loan Agreement on an emergency basis without notice to the Debtor's unsecured creditors on August 20, 1993. A final hearing was set for September 9, 1993, at which time the only objection was to a provision in

the Loan Agreement which would pay Giberson $400,000 in exchange for Giberson's "expertise, skills, and advice" in assisting the Debtor in its performance of the Subcontract. This provision was not addressed in the Court's Order approving the Loan Agreement, and the Court indicated that it would closely scrutinize any request by Giberson for consulting fees before approving the payment of such fees. Alberici did not receive notice of the Loan Agreement.

On August 18, 1993, Alberici received the $100,000 letter of credit. A week later, Alberici received the Debtor's Certificate of Insurance. As a result of these actions, Alberici signed the Subcontract. Notice of the signed Subcontract was sent to the Debtor on August 27, 1993. The Debtor executed the labor agreement with the ironworkers on August 31, 1993, and commenced work with its own employees on the project on September 1, 1993.

Pursuant to the Loan Agreement, a bank account was opened on August 17, 1993, at Magna Bank of Illinois in the name of "Marrs–Winn Co., Inc., Debtor-in-Possession." All payments by Alberici under the Subcontract were to be deposited into this account. According to the Loan Agreement, all funds placed in the Magna account "shall be withdrawn only pursuant to the signature of Marrs–Winn and Giberson." A bank resolution supplied by Magna Bank was signed only by the Debtor's president, and the Debtor's president was the only named individual authorized to make a transfer of funds. The account was not specifically designated as a "trust account".

As of December 1, 1993, the Magna account had a balance of nearly $20,000. At this time, Alberici approved two transfers to the Magna account: (1) a payroll-related transfer of $79,610.67 to cover the Debtor's upcoming project payroll and payroll-related expenses; and (2) a progress payment of $112,452.61.

On December 1, 1993, Giberson transferred $112,462.61 from the Debtor's Magna account to Giberson's own account. On December 3, 1993, Giberson transferred $99,000 from the Magna account to its own account.

These transfers were made without the consent of the Debtor.

On January 4, 1994, the Debtor and Alberici filed a Joint Complaint to Avoid Post–Petition Transfer and For a Declaratory Judgment. The Complaint seeks the return of the withdrawn funds and a declaration that the withdrawn funds are trust fund assets pursuant to the Subcontract. On January 25, 1994, Giberson filed a Motion for Order Approving Application of Funds and Provision of Priority Interest. As the title of its motion suggests, Giberson seeks approval of its application of the withdrawn fund to its debt.

At the outset, the Court finds that Giberson's withdrawal of the funds from the Magna account violated the Loan Agreement. According to the Loan Agreement, withdrawals from the account were to be made "only pursuant to the signature of MARRS–WINN and GIBERSON". Marrs–Winn did not sign the two withdrawals in dispute. Giberson's withdrawal of the funds without the Debtor's signature violated the Loan Agreement whereby both Giberson and the Debtor signed all checks from the account. In fact, the Debtor's president testified that Giberson was adamant that checks were not to be written by one party alone.

Giberson's withdrawal of the funds from the Magna account also violated the automatic stay of 11 U.S.C. § 362. This section of the Bankruptcy Code prohibits a creditor from taking actions to obtain possession of property of the estate or to enforce a lien against property of the estate. While the Court's Order approving the Loan Agreement modified the automatic stay "to permit Giberson to receive the proceeds of accounts receivable as hereinabove authorized," the withdrawal of the funds by Giberson was unauthorized because it was done without the signature of the Debtor. Giberson did not have the authority decide on its own that the funds in the Magna account should be applied to the Giberson debt. Under these circumstances, Giberson should have sought a modification of the automatic stay before transferring the funds in the Magna account to its own account.

The Court now turns to the question of whether Giberson was entitled to the withdrawn funds. Giberson argues that the Loan Agreement and the Court's Order approving the agreement authorized its actions. Alberici argues that the funds in the Magna account were trust fund assets beyond the reach of Giberson. Alberici relies on the Subcontract; Giberson relies on the Loan Agreement and Court Order. A review of these documents is a necessary start to the Court's analysis.

Exhibit A of the Subcontract is entitled "Additional Terms and Conditions". Paragraph 2.5 of Subcontract Exhibit A provides as follows:

2.5 All sums tentatively earned by Subcontractor by the partial or complete performance of the Subcontract Work and any balance of unearned Subcontract price, if and when paid by Owner to Contractor, shall constitute a fund for purpose of (a) full and timely completion of the Subcontract Work and fulfillment of all Subcontract requirements, (b) payment of any backcharges or claims due Contractor from Subcontractor based upon this Subcontract or otherwise, and (c) payment to the sub-contractors, workers, design professionals, material and service suppliers of Subcontractor, and others who have valid and enforceable mechanic's lien claims or valid and enforceable bond claims (if the project is bonded). Such tentative earnings shall not be due or payable to Subcontractor or anyone else claiming in Subcontractor's place and stead, including but not limited to a Trustee in bankruptcy or receiver, until and unless such Subcontract Work is fully and satisfactorily completed, all Subcontract requirements are fulfilled, Contractor and such persons are fully paid and satisfied and the provisions of subparagraph 2.6 below are fully satisfied. Subcontractor agrees to promptly pay all subcontractors, workers, vendors and suppliers of Subcontractor and to provide Contractor with each application for periodic progress payments, and the final payment, such lien waivers or proof of such payment as Contractor may require. At any time, Contractor may demand additional written evidence of Subcontractor's capability to perform and of such payments to such persons by Subcontractor. Subcontractor declares that all funds received by Subcontractor from Contractor hereunder shall be deemed to be held by Subcontractor in Trust for the benefit of those furnishing work, labor, materials, services, equipment, etc., to or through Subcontractor for the Subcontract Work.

Exhibit G to the Subcontract is entitled "Special Conditions". Paragraph 2 of Subcontract Exhibit G provides as follows:

Contractor will transfer funds into a Special Marrs–Winn Stadium Payroll Account to funds: (1) payroll to on-site workers and on-site supervisors, and (2) taxes, fringes and benefits based on such payroll. Such transfers will occur weekly, monthly or quarterly as required to effect prompt payment of the payroll or payroll related item. Amounts so transferred will be credited as subcontract payments to Subcontractor against its monthly estimates of completion and pay application. Such payroll and payroll related payments will continue so long as the Subcontract is not in default, and until completion or until the subcontract sum (less retention) is fully paid or credited to Subcontractor, whichever first occurs.

Subject always to the above provisions, the mechanics of the special payroll payments shall be as follows: Subcontractor will provide Contractor with a certified copy of Subcontractor's craft and on-site supervisory payroll by 12:00 noon on Wednesday of each week prior to the Friday payday when Subcontractor's payroll checks are to be issued to the payees on the Special Marrs–Winn Stadium Payroll Account. The payroll shall show the names of the craft workers and supervisors working on the job site to be paid from such account, the amount to be paid to each payee, and the amount required to cover such payroll checks and the payroll related charges. Contractor will transfer good funds to such account by wire transfer prior to 12:00 noon on the designated payday to cover the payroll checks issued by Subcontractor. In a like manner, Contractor will transfer funds, when due, to the tax and

fringe accounts and appropriately document for the records of the payees, Subcontractor and Contractor such payments by Contractor on behalf of Subcontractor for work on the Stadium project. Subcontractor agrees to open and establish such Bank accounts, and provide such authorizations and documents necessary to implement the payment procedures herein set forth. Subcontractor acknowledges that these payment procedures are being utilized in lieu the Performance Bond and Labor & Materials Payment Bond referenced in paragraph 24 of Exhibit "A" to this Subcontract.

Section 1.2 of the Loan Agreement between Giberson and the Debtor defines indebtedness as including all indebtedness and liabilities owed to Giberson by the Debtor, all future advances made by Giberson for the protection of Giberson's interests, and all costs and expenses incurred by Giberson in protecting its collateral. Section 1.6 provides that collateral for the loan includes the following:

(a) All deposits, accounts, instruments, letters of credit, negotiable documents, chattel paper, or any other property in which MARRS–WINN has rights and which are at any time in possession or control of GIBERSON;

(b) Accounts receivable now existing or hereafter created, specifically including, without limitation, all rights, claims, and interest in the subcontract (defined later herein);

(c) All inventory and equipment now owned or hereafter acquired, all accounts receivable now existing or hereafter arising, and any and all other assets of MARRS–WINN, whether now owned or hereafter acquired, Likewise, such term shall include any and all proceeds derived from any of the items described within Sections 1.6(a), 1.6(b), or 1.6(c) of this Agreement; and

(d) The term "Collateral" shall also include all other property and interest in property which shall, from time to time, secure the loan evidenced by this Agreement.

In Section 2 of the Loan Agreement, the Debtor warrants that the agreement does not constitute a breach or default of any of the Debtor's other agreements, that the Debtor has disclosed all material facts, that there was no relevant litigation pending, and that the Debtor had good title to all of its property. Section 4 provides that parties agree to cooperate with each other, and that Giberson will have the right to inspect all books and records of the Debtor.

In Section 5 of the Loan Agreement, Giberson agreed to pay $13,737.80 to the ironworkers, $58,000 for past insurance premiums, and to provide a $100,000 letter of credit. The limit on cash advances was $150,000. The Debtor agreed to repay these advances pursuant to the terms of the note. The parties also agreed to establish a joint account:

5.4 MARRS–WINN covenants and agrees that it shall establish, and execute any further documentation to effectuate, a joint account at Magna Bank located in Decatur, Illinois, or a likewise institution acceptable to GIBERSON, into which account all payments made pursuant to the subcontract to MARRS–WINN shall be placed. The parties hereto understand and agree that certain payments are being made by J.S. Alberici Construction Co., Inc., pursuant to the subcontract, directly to future creditors of MARRS–WINN, including payroll, and such payments will not be placed in the bank account described herein.

5.5 All funds placed within the account at Magna (or other acceptable institution) shall be withdrawn only pursuant to the signature of MARRS–WINN and GIBERSON. MARRS–WINN expressly agrees to execute any and all documents required by GIBERSON to obtain sole possession of funds in satisfaction of obligations or liabilities of MARRS–WINN described herein.

Section 8.2(a) barred the Debtor from making any payments outside of the ordinary course of business, and the Debtor was prohibited by Section 8.2(d) from assuming any liability or obligation which could adversely

affect the Debtor's ability to perform its obligations under the Loan Agreement.

Although the Loan Agreement was entered into before the Subcontract was finally signed by Alberici, Giberson was well aware of the provisions in the Subcontract when it entered into the Loan Agreement. Indeed, the Loan Agreement makes several specific references to the Subcontract. Moreover, Mr. Giberson of Giberson Electric admitted at his deposition that he had read through the Subcontract and had seen the Special Conditions of Exhibit G before he signed the Loan Agreement.

The Court approved the Loan Agreement on August 20, 1993. The Court's Order granted Giberson a first priority security interest in all of the Debtor's property, and stated that all advances from Giberson were payable on demand. The Order authorized Giberson "to collect, receive and apply post-Chapter 11 accounts receivable and the proceeds thereof to the indebtedness of Debtor to Giberson under the Agreement". The Order approved the continuation of the "lock box arrangement between Debtor and Giberson" and authorized Giberson to "withdraw all remittances made to the lock boxes" and "apply the proceeds of said remittances to the indebtedness due it from the Debtor".

The critical issue for the Court to determine is whether the withdrawn funds constituted trust funds in which the Debtor had only bare legal title. Pursuant to 11 U.S.C. § 541(d), property of the bankruptcy estate does not include any equitable interest in property where the Debtor holds legal title only. The legislative history to § 541 provides this explanation and example:

> Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in constructive trust for the person to whom the bill was owed.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 368 (1977); S.Rep. No. 989, 95th Cong., 2nd Sess. 82 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5868, 6324. *See, T & B Scottdale Contractors, Inc. v. United States,* 866 F.2d 1372, 1376 (11th Cir.1989).

■ While the question of whether a debtor's interest in property is "property of the estate" is a federal question to be decided by federal law, the Court must look to the applicable state law to determine whether and to what extent the Debtor has any legal or equitable interests in property. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *In re Yonikus,* 996 F.2d 866 (7th Cir.1993). Here, the Subcontract choice of law provision provides that the project location site, Missouri, governs the Subcontract. Accordingly, the Court must look to Missouri law to determine whether Subcontract Paragraph 2.5 creates a trust fund.

■ Under Missouri law, an express trust consists of four elements: (1) identified beneficiaries; (2) a trustee; (3) an identifiable trust res; and (4) delivery of the trust res. *Electrical Workers, Local No. 1 Credit Union v. IBEW–NECA Holiday Trust Fund,* 583 S.W.2d 154, 161 (Mo.1979). In this case, all four elements exist. Paragraph 2.5 of Subcontract A identifies the beneficiaries of the trust as the Contractor, Alberici, for any backcharges or claims due to Alberici by the Debtor, and "the subcontractors, workers, design professionals, material and service suppliers of Subcontractor and others who have valid and enforceable mechanic's lien claims or valid and enforceable bond claims". The last sentence of Paragraph 2.5 designates the Debtor as the trustee of the funds: "Subcontractor declares that all funds received by Subcontractor from Contractor hereunder shall be deemed to be held by Subcontractor in Trust for the benefit of those furnishing work, labor, materials, services, equipment, etc., to or through Subcontractor for the Subcontractor work". The trust res is identified as "[a]ll sums tentatively earned by Subcontractor by the partial or complete performance of the Subcontract Work and any balance of unearned Subcontract price, if and when paid by Owner to

Contractor". Actual delivery of the trust res was accomplished when Alberici transferred the funds to the Debtor or the Debtor's account. Accordingly, the proceeds in the Debtor's Magna account and the progress payment represented trust funds which were to be distributed to the beneficiaries of the trust.

Since the Debtor held only a legal, not beneficial, interest in the funds in the Magna account, Giberson's security interest did not attach to these funds. Giberson did not have any rights under the Loan Agreement in the trust funds until the Debtor's trust obligation to first pay the Contractor and Subcontractors engaged by it to perform labor or furnish materials had been discharged. *In re Mastercraft Metals, Inc.*, 114 B.R. 183, 187 (Bankr.W.D.Mo.1990). Accordingly, Giberson's seizure of the funds in the Magna account was wrongful and improper.

■ Giberson argues that the Loan Agreement and Court Order specifically authorized it to seize the funds in the Magna account. To the extent that there is a conflict between the Loan Agreement and the Subcontract, the Court finds that the Subcontract controls. While the Subcontract was not fully executed until after the Loan Agreement and Court Order, it was in existence long before the Loan Agreement. Indeed, the whole purpose of the Loan Agreement was to allow the Debtor to perform the Subcontract. Giberson was well aware of the provisions in the Subcontract and the Loan Agreement makes several references to the Subcontract. Alberici was not given notice of the Loan Agreement, and thus never had a chance to object to it. While the court did enter an Order approving the Loan Agreement, the Court also entered an Order allowing the Debtor to assume the Subcontract. Considering all the circumstances, the Court believes that the Subcontract takes precedence over the Loan Agreement.

In any event, the Court finds that there is no conflict between the Loan Agreement and subcontract. The Loan Agreement grants Giberson a superpriority security interest in the Debtor's "collateral", with "collateral" being defined as the Debtor's bank accounts, accounts receivable, and other payments in which the Debtor has an interest. The Court reads the Loan Agreement to mean bank accounts in which the Debtor has equitable rights. Moreover, funds payable to the Debtor under the Subcontract did not become "accounts receivable" until the Debtor satisfied all of its obligations under the Subcontract.

Giberson relies on *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1355 (7th Cir.1990) for the propositions that a lender that extends credit in reliance on a financing order is entitled to the benefit of that order, even if it turns out to be legally or factually erroneous "and" that bankruptcy judges may make "binding commitments to give priority to new credit". However, as Judge Ginsberg observed in *In re Tek–Aids Industries, Inc.*, 145 B.R. 253, 258 (Bankr.N.D.Ill.1992), *Kham & Nate* does not apply where the lender and the debtor ignore the due process rights of third parties. Here, Giberson is trying to use the Court's Order authorizing the Loan Agreement to cut off the rights of Alberici and the Debtor's Subcontractors, third parties who did not have notice of the Loan Agreement. Thus, *Kham & Nate* is not applicable to this case.

■ Finally, Giberson suggests that if there is a trust relationship, the Giberson is included within the designated beneficiaries of the trust. This completely meritless argument contains more than its share of unmitigated effrontery. Paragraph 2.5 provides that only Subcontractors holding mechanic's lien claims or claims against Alberici's labor and materials payment bond are beneficiaries of the trust. There is no evidence that Giberson's consulting services to the Debtor— as contrasted with the engineering services or construction labor utilized in building physical improvements—are lienable under Missouri's mechanic's lien law or covered under Alberici's payment bond. Moreover, there is no evidence of any financial services by Giberson for the benefit of the Debtor; financial disservices would be a more accurate description of Giberson's actions. While supposedly serving as the Debtor's financial advisor, Giberson unilaterally seized funds intended for payroll and other legitimate debts, and thereby prevented the Debtor

from meeting its obligations and causing Alberici to declare the Debtor in default. These actions were clearly contrary to Giberson's obligation under the Loan Agreement to make available to the Debtor "Giberson's expertise, skills, and advice in assisting" the Debtor's performance of the Subcontract. Further, the Court indicated at the hearing on the Loan Agreement that the Court would have to review the consulting work of Giberson before the Court authorized the payment of $400,000 or any other sum to Giberson for its consulting work. Giberson never made an application to the Court for fees under the consultation provision of the Loan Agreement.

■ For the foregoing reasons, the Court finds that Giberson Electric, Inc. wrongfully seized $211,452.61 from the bank account of the Debtor, Marrs–Winn Company, Inc. at the Magna Bank of Illinois. Accordingly, Giberson Electric's Motion for Order Approving Application of Funds and Provision of Priority Interest is denied. The Court further finds in favor of the Plaintiffs, Marrs–Winn Company, Inc. and J.S. Alberici Construction Company, Inc., and against the Defendant, Giberson Electric, Inc., on the Joint Complaint to Avoid Post–Petition Transfer and for Declaratory Relief. Giberson is hereby directed to turn over to the Debtor the sum of $211,452.61, plus interest at the Missouri judgment rate of 9% for distribution by the Debtor to the beneficiaries of those funds in accordance with the terms of the Subcontract.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.