KANNE, Circuit Judge.
 

 This case arises out of the construction of St. Louis, Missouri’s new domed football stadium — now known as the Trans-World Dome — which serves as the home of the National Football League’s St. Louis Rams. Plaintiff-Appellee J.S. Alberici Construction Co., Inc., (“Alberici”) was the general contractor on the stadium project, and Plaintiff-Appellee-Debtor Marrs-Winn Co., Inc. (“Marrs-Winn”)
 
 [1]
 
 was a subcontractor who installed reinforcing steel and post-tensioning cable on the project. Defendant-Appellant Giberson Electric, Inc. (“Giberson”) loaned money to Marrs-Winn in order to allow Marrs-Winn to comply with the terms of its contract (the “Subcontract”) with Alberici.
 

 At issue is whether Giberson wrongfully seized $211,462.61 from a bank account held in the. name of Marrs-Winn as Debtor-in-Possession. The answer to this question rests on whether those funds were trust funds held for the benefit of Marrs-Winn’s laborers and materialmen, or whether Marrs-Winn acquired equitable title to those funds, thereby making them subject to Gi-berson’s first priority security interest. Because we find that the Subcontract designated these monies as trust funds, and that the financing order approving the Giber-son/Marrs-Winn loan agreement did not trump the Subcontract, we agree with the courts below that Giberson wrongfully seized the $211,462.61. Thus, we affirm the opinion of the district court.
 

 I. HISTORY
 

 Pursuant to the general contract on the stadium project, Alberici was required to assist or “mentor” minority-owned businesses. On May 18, 1993, Alberici informed Marrs-Winn, a struggling minority-owned construction company, that it intended to award Marrs-Winn a subcontract on the project. Alberici agreed to pay Marrs-Winn $6,896,-900 in return for Marrs-Winn’s work to furnish and install reinforcing steel, post-ten-sioning cable, and related accessories on the stadium. This Subcontract also required Marrs-Winn to furnish certain payment and performance bonds.
 

 Initially, Marrs-Winn could not satisfy the bonding requirements, nor could it contract with the union iron-workers needed to perform the job. Thus, on June 11,1993 Alberi-ci informed Marrs-Winn that it would not sign the Subcontract until it received adequate bonds. In addition, Alberici informed Marrs-Winn that it would begin the reinforcing work and later “charge Marrs-Winris Subcontract for the costs associated with this activity.” On June 21, 1993, Alberici began performing the reinforcing work, using iron-workers employed and paid by Alberici; Al-berici subsequently “backcharged” Marrs-Winn $296,724.25 for this work, $205,722.59 of which Alberici incurred before August 10, 1993.
 

 Marrs-Winn needed assistance in satisfying the bonding requirements so that it could begin work on the dome. In May or June of
 
 *587
 
 1993, Giberson and Marrs-Winn first discussed the possibility of Giberson lending money to Marrs-Winn. On July 31, 1993, Giberson sent a letter to Alberici expressing Giberson’s willingness to finance Marrs-Winn and to implement special procedures to handle Marrs-Winn’s progress payments and payroll expenses.
 

 Marrs-Winn ultimately obtained the necessary guarantees to satisfy Alberici. As a result, on August 9,1993 Alberici and Marrs-Winn added “Exhibit G” to the Subcontract. Exhibit G required Marrs-Winn to post a $100,000 letter of credit in favor of Alberici and established a special account to facilitate the payment of Marrs-Winn’s payroll expenses for the project.
 

 Nonetheless, Marrs-Winn filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code the very next day — August 10, 1993. Marrs-Winn eventually entered a financing agreement with Giberson in order to meet its obligations under the Subcontract. Marrs-Winn and Giberson entered into this Business Loan and Security Agreement (“BLSA”) on. August 19, 1993. The BLSA required Giberson to post the $100,000 letter of credit and provided that Giberson advance up to $150,000 to Marrs-Winn so that it could proceed with its performance of the Subcontract.
 

 Marrs-Winn and Giberson sought the bankruptcy court’s approval of the BLSA, characterizing the agreement as essential to Marrs-Winn’s ability to perform the Subcontract. The bankruptcy court subsequently approved the BLSA in its Order Authorizing Debtor to Borrow Money, Grant Security Interest and Accord Priority Claim Status (the “Financing Order”). It is undisputed that Giberson was aware of the existence of the Subcontract when it signed the BLSA and when the bankruptcy court entered the Financing Order.
 

 The Financing Order, dated August 20, 1993, granted Giberson a first priority security interest, in all of Marrs-Winn’s presently existing, later created, or later acquired personal property including all of its inventory, accounts, accounts receivable, contracts, contract rights, documents, instruments, chattel paper, machinery, fixtures, cash proceeds, and non-cash proceeds. The Financing Order further provided that all advances from Giberson were payable on demand.
 

 Alberici received the $100,000 letter of credit on August 18,1993, and the next week Alberici received Marrs-Winn’s Certificate of Insurance. On August 27, 1993, Alberici signed the Subcontract, which is dated May 18, 1993. Marrs-Winn executed a. labor agreement with the union ironworkers on August 31, 1993 and began work on the stadium project with its own employees on September 1,1993.
 

 Meanwhile, on August 17, 1993 Marrs-Winn and Giberson opened the bank account that is the focus of the entire case. The presidents of both Marrs-Winn and Giberson set up an account at the Magna Bank of Illinois under the name “Marrs-Winn Co., Inc., Debtor-in-Possession” (the “Magna Account”).
 
 [2]
 
 This account was not specifically designated as a “trust account.” A Magna Bank resolution, signed only by Marrs-Winn’s president, revealed that Marrs-Winn’s president was the only named individual authorized to transfer account funds.
 

 Alberici claimed this account was the special payroll account contemplated by Exhibit G of the Subcontract. Pursuant to Exhibit G, Alberici agreed to “transfer funds into a Special Marrs-Winn Stadium Payroll Account to fund: (1) payroll to on-site workers and on-site supervisors, and (2) taxes, fringes and benefits based on such payroll.” Exhibit G further outlined the detailed procedures that Alberici and Marrs-Winn would follow when transferring these payroll and payroll-related funds to the payroll account. Finally, Exhibit G required Marrs-Winn “to open and establish such Bank accounts, and provide such authorizations and documents
 
 *588
 
 necessary to implement the payment procedures herein set forth.”
 

 Giberson, on the other hand, contended that the Magna Account was the “lockbox” account contemplated by the BLSA and the Financing Order. The BLSA provided:
 

 5.4 MARRS-WINN covenants and agrees that it shall establish, and execute any further documentation to effectuate, a joint account at Magna Bank located in Decatur, Illinois, or a likewise institution acceptable to GIBERSON, into which account all payments made pursuant to the subcontract to MARRS-WINN shall be placed. The parties hereto understand and agree that certain payments are being made by J.S. Alberiei Construction Co., Inc., pursuant to the subcontract, directly to future creditors of MARRS-WINN, including payroll, and such payments will not be placed in the bank account described herein.
 

 5.5 All funds placed within the account at Magna (or other acceptable institution) shall be withdrawn only pursuant to the signature of MARRS-WINN and GIBER-SON. MARRS-WINN expressly agrees to execute any and all documents required by GIBERSON to obtain sole possession of funds in satisfaction of obligations or liabilities of MARRS-WINN described herein.
 

 The Financing Order approved the lockbox arrangement and authorized Giberson to “withdraw all remittances made to the lock boxes” and to “apply the proceeds of said remittances to the indebtedness due to it from the Debtor.”
 

 In late November 1998, Alberiei issued its first progress payment of $112,462.61 to Marrs-Winn in the form of a check made payable to Marrs-Winn. At a meeting held on or about December 1,1993, Marrs-Winn’s president (Charles Currie) asked Giberson’s president (Phillip Giberson) to co-sign a $50,-000 check payable to Alberiei to cover the first installment payment on the Alberiei “backcharge.” Giberson refused to sign the $50,000 check. Instead, Giberson took possession of the $112,462.61 progress payment cheek; Currie, however, did not authorize Giberson to take any of the proceeds of that check.
 

 As of December 1, 1993, the Magna Account balance was approximately $20,000. On that same day, Alberiei approved a payroll-related transfer of $79,610.67 to the Mag-na Account. Also on December 1, Giberson, who now possessed the $112,462.61 progress payment check, deposited that check into the Magna Account. Later that day, Giberson transferred $112,462.61 from the Magna Account to its own account without the permission or signature of Marrs-Winn. On December 3,1993, Giberson transferred $99,000 from the Magna Account to its own account, again without Marrs-Winn’s signature or approval. During the week of December 6, 1993, Marrs-Winn and Alberiei learned of Giberson’s seizure of the $211,462.61 from the Magna Account.
 

 On January 4, 1994, Marrs-Winn and Al-berici filed a complaint in the bankruptcy court demanding that Giberson return the funds it transferred out of the Marrs-Winn Magna Account. On January 25, 1994, Gi-berson countered by filing a motion seeking the bankruptcy court’s approval of its seizure of these funds to apply against Marrs-Winn’s debt.
 

 The bankruptcy court ruled against Alberi-ci making three separate findings. First, the court found that Giberson’s withdrawal of funds from the Magna Account violated the loan agreement because withdrawals were to be made “only pursuant to the signature of MARRS-WINN and GIBERSON.” Next, the court ruled that Giberson’s withdrawal of the funds violated the automatic stay provision imposed by 11 U.S.C. § 362 because Giberson lacked the authority to unilaterally seize the Magna Account funds and apply them against Marrs-Winn’s debt. Finally, the court determined that Giberson’s first priority security interest did not authorize its withdrawal of the Magna Account funds. The court reasoned that those funds were trust funds in which Marrs-Winn had only bare legal title, and as such, those funds were not part of the bankruptcy estate and not subject to Giberson’s priority security interest.
 

 
 *589
 
 The bankruptcy court ordered Giberson to return the $211,452.61,
 
 [3]
 
 plus interest, to Marrs-Winn for distribution of those funds to the trust beneficiaries as outlined in the Subcontract. The district court affirmed the bankruptcy court’s decision finding that Giberson wrongfully seized the Magna Account funds. See
 
 In re Marrs-Winn Co.,
 
 193 B.R. 491 (C.D.Ill.1996). Giberson subsequently brought this appeal.
 

 II. ANALYSIS
 

 A
 
 Standard of Review
 

 In a second appeal from the bankruptcy court’s decision, we use the same standard of review used by the district court below: the bankruptcy court’s findings of fact are upheld unless clearly erroneous, the bankruptcy court’s determinations of witness credibility are given due regard, and the bankruptcy court’s legal conclusions are reviewed
 
 de novo. See
 
 Fed. R. Bankr.P. 8013;
 
 In re FedPak Systems, Inc.,
 
 80 F.3d 207 (7th Cir.1996). Here, we primarily utilize a
 
 de novo
 
 standard of review because most of the evidence was presented by stipulation, the testimony was essentially undisputed, and the bankruptcy court’s decision rested solely on legal conclusions.
 

 B.
 
 Existence and Enforcement of the Trust
 

 Both courts below correctly found that the funds Giberson removed from Marrs-Winn’s Magna Account were trust funds. As such, those funds came to Marrs-Winn’s bankruptcy estate subject to the claims of the trust beneficiaries detailed in the Subcontract, not subject to Giberson’s first priority security interest established by the BLSA and the Financing Order.
 

 1.
 
 Legal vs. Equitable Interest.
 

 The bankruptcy court’s jurisdiction over Marrs-Winn’s property extends only as far as Marrs-Winn’s particular interest in the property. Accordingly, the Bankruptcy Code embraces the crucial distinction between a legal interest and an equitable interest in property. Although a debtor’s bankruptcy estate includes “all legal or equitable interests of the debtor in property as of the commencement of the case,” 11 U.S.C. § 541(a)(1), the Code recognizes that the property of the bankruptcy estate does not include any interest in which the debtor holds only bare legal title. In that regard, § 541(d) provides:
 

 Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor’s legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.
 

 11 U.S.C. § 541(d). From the plain language of the Code, one can easily conclude that the debtor’s bankruptcy estate does not include property held in trust for another.
 
 See United States v. Whiting Pools, Inc.,
 
 462 U.S. 198, 205 n. 10, 103 S.Ct. 2309, 2314 n. 10, 76 L.Ed.2d 515 (1983) (noting in
 
 dicta
 
 that “Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition”).
 

 It is a well-settled principle that debtors do not own an equitable interest in property that they hold in trust for another, and thus, those trust funds are not “property of the estate.”
 
 City of Farrell v. Sharon Steel Corp.,
 
 41 F.3d 92, 95 (3d Cir.1994) (citing
 
 Begier v. I.R.S.,
 
 496 U.S. 53, 59, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990) and
 
 Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters., Inc.,
 
 960 F.2d 366, 371 (3d Cir.1992)). Accordingly, several courts of appeals have held that when a debtor receives money as a trustee pursuant to a statutory, express, or implied trust, the debtor acquires only bare legal title to the trust proceeds and maintains no equitable interest in those proceeds. As such, those trust proceeds can only be distributed to trust beneficiaries, and not to the creditors of the bankruptcy estate.
 

 
 *590
 
 In
 
 T & B Scottdale Contractors, Inc. v. United States,
 
 866 F.2d 1372 (11th Cir.1989), for example, the Eleventh Circuit held that certain funds were not part of a subcontractor’s bankruptcy estate because the general contractor paid those monies into a joint bank account for the sole purpose of paying the subcontractor’s materialmen.
 
 Id.
 
 at 1376. The general contractor (T & B Scottsdale — “T & B”) and the subcontractor (Rodger & Rodger — “R & R”) entered into a contract in 1982 requiring T & B to create and control a bank account in R & R’s name for the sole purpose of paying the subcontractor’s suppliers.
 
 Id.
 
 at 1373-74. The account functioned in the following fashion: T & B would deposit money into the account, write a check from that account to R & R’s supplier, send the check to R & R for its signature, and finally forward the check to the supplier for payment.
 
 Id.
 
 In the fall of 1993, the IRS served a levy notice on this account citing R & R’s failure to pay back taxes.
 
 Id.
 
 at 1374. Subsequently, R & R filed for bankruptcy; this action prompted T & B, Trust Company Bank (R & R’s lender), and the bankruptcy trustee to claim an interest in the money.
 
 Id.
 
 Relying upon § 541 of the Bankruptcy Code, the court held that R & R held these funds in trust for its materialmen and therefore, those funds were not part of the bankruptcy estate.
 
 Id.
 
 at 1376.
 

 In
 
 Universal Bonding Insurance,
 
 the Third Circuit similarly relied upon § 541(d) in holding that certain monies were not subject to the debtor’s bankruptcy estate due to their status as trust funds. 960 F.2d at 371. The court found that the New Jersey Trust Fund Act imposed a statutory trust on certain funds that Gittens (the debtor/ contractor) had received or would receive from state and municipal agencies; these funds were to be held in trust for the benefit of laborers and materialmen.
 
 Id.
 
 These funds were not subject to Gittens’s bankruptcy estate because “property in which the debtor holds only legal title, and ... not ... an equitable interest, such as trust funds, is included in the bankrupt’s estate only to the extent of the debtor’s legal title to the property and not to the extent of any interest in the property that the debtor does not hold.”
 
 Id.
 
 Furthermore, the court added that its holding was not “affected by the fact that Gittens received or will receive payments
 
 after,
 
 rather than
 
 before,
 
 its bankruptcy filing”; in either case “those funds would have remained in Gittens’ hands as trust funds” and Gittens never “possessed the right to use the contract balances at issue ... for its own benefit.”
 
 Id.
 
 at 372-73.
 

 The Sixth Circuit addressed a similar issue in
 
 Federal Insurance Co. v. Fifth Third Bank,
 
 867 F.2d 330 (6th Cir.1989). There, the court held that two progress payments delivered by the State of Ohio to a contractor pursuant to a construction agreement were trust funds to be held for the benefit of job creditors. Id. at 331-34. Thus, the contractor’s lender could not offset these payments against the debt it was owed by the contractor. Id. at 832-34.
 

 Even those decisions that ultimately hold that a contract or state law does not create an express or constructive trust adhere to the principle that a bankruptcy estate does not include those properties to which the debtor retains only bare legal title. See,
 
 e.g., In re Sakowitz, Inc.,
 
 949 F.2d 178, 181 (5th Cir.1991) (finding neither an express nor implied trust but noting that “property held in trust for another is not property of the estate under 11 U.S.C. § 541 in the event of the trustee’s bankruptcy”);
 
 Georgia Pac. Corp. v. Sigma Serv. Corp.,
 
 712 F.2d 962, 968 (5th Cir.1983) (finding that neither state lien statutes nor a joint-check arrangement created constructive trusts for the benefit of Sigma’s materialmen but noting that if “all or part of the money so owed was subject to a constructive trust in favor of the suppliers ... the bankruptcy court would be required to recognize those equitable interests and, perhaps, the debtor in possession’s sole permissible administrative act ... would be to pay over or endorse the sums due to the beneficial owners of the property”).
 

 Thus, if Marrs-Winn held “only legal title and not an equitable interest” in the funds located in the Magna Account as a result of a valid trust arrangement, Giberson could not properly acquire an interest in those proceeds via the Financing Order. As such, we
 
 *591
 
 must determine whether the Subcontract created a valid trust arrangement.
 

 2.
 
 The Express Trust.
 

 The question of whether a debtor’s interest in property is “property of the estate” is a federal question to be decided by federal law, yet courts must look to the applicable state law to determine the extent (if any) of the Debtor’s legal or equitable interest in the property.
 
 In re Yonikus,
 
 996 F.2d 866 (7th Cir.1993);
 
 see Butner v. United States,
 
 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) (“Property interests are created and defined by state law.”);
 
 UNR Indus., Inc. v. Continental Cos. Co.,
 
 942 F.2d 1101, 1103 (7th Cir.1991) (“State law controls the determination of assets in a bankrupt estate, unless federal interests require a different result.”). In that regard, we must first determine which state’s laws to apply in interpreting the extent of Marrs-Winn’s interest in the Magna Account funds.
 

 The Subcontract included a choice of law provision which provided that the law of Missouri, the site of the project location, would govern any legal disputes. Neither party challenges the application of Missouri law. Thus, we look to Missouri law to determine whether the Subcontract created a valid trust arrangement.
 

 Missouri law requires four elements for a valid express trust: identified beneficiaries, a trustee, an identifiable trust
 
 res,
 
 and actual delivery of the trust corpus.
 
 Electrical Workers, Local No. 1 Credit Union v. IBEW-NECA Holiday Trust Fund,
 
 583 S.W.2d 154, 161 (Mo.1979) (en banc).
 

 Subparagraph 2.5 of Subcontract Exhibit A provides the key language we must analyze in determining whether the seized monies were trust funds under Missouri law. That paragraph provides:
 

 All sums tentatively earned by Subcontractor [Marrs-Winn] by the partial or complete performance of the Subcontract Work and any balance of unearned Subcontract price, if and when paid by Owner to Contractor [Alberici], shall constitute a fund for the purpose of (a) full and timely completion of the Subcontract Work and fulfillment of all Subcontract requirements,(b) payment of any backcharges or claims due Contractor [Alberici] from Subcontractor [Marrs-Winn] based upon this Subcontract or otherwise, and (c) payment to the sub-subcontractors, workers, design professionals, material and service suppliers of Subcontractor [Marrs-Winn], and others who have valid and enforceable mechanic’s lien claims or valid and enforceable bond claims (if the project is bonded). Such tentative earnings shall not be due or payable to Subcontractor [Marrs-Winn] or anyone else claiming in Subcontractor’s [Marrs-Winn’s] place and stead, including but not limited to a Trustee in bankruptcy or receiver, until and unless such Subcontract Work is fully and satisfactorily completed, all Subcontract requirements are fulfilled, Contractor [Alberici] and such persons are fully paid and satisfied and the provisions of subparagraph 2.6 below are fully satisfied. Subcontractor [Marrs-Winn] agrees to promptly pay all sub-subcontractors, workers, vendors and suppliers of Subcontractor [Marrs-Winn] and to provide Contractor [Alberici] with each application for periodic progress payments, and the final payment, such lien waivers or proof of such payment as Contractor [Al-berici] may require. At any time, Contractor [Alberici] may demand additional written evidence of Subcontractor’s [Marrs-Winn’s] capability to perform and of such payments to such persons by Subcontractor [Marrs-Winn]. Subcontractor [Marrs-Winn] declares that all funds received by Subcontractor [Marrs-Winn] from Contractor [Alberici] hereunder shall be deemed to be held by Subcontractor [Marrs-Winn] in Trust for the benefit of those furnishing work, labor, materials, services, equipment, etc., to or through Subcontractor [Marrs-Winn] for the Subcontract Work.
 

 In this case, both the single progress payment of $112,462.61 and the $99,000 in payroll monies contain the four necessary elements of an express trust in Missouri.
 

 In regard to the single progress payment of $112,462.61, the intended
 
 beneficiaries
 
 were clearly detailed in subparagraph 2.5.
 
 *592
 
 The beneficiaries of those trust proceeds were the contractor (Alberici) with respect to the “backcharges” and “claims” it was owed, as well as Marrs-Winn’s subcontractors, workers, design professionals, material providers, service providers, and others who have valid and enforceable mechanic lien claims or bond claims. The record shows that Marrs-Winn intended for Alberici to receive $50,000 of this progress payment as the first installment to repay the approximately $300,000 Marrs-Winn owed Alberici in “backcharges” for work Alberici performed on Marrs-Winn’s behalf; the rest of the progress payment was earmarked for other project-related expenses. Second, sub-paragraph 2.5 defined Marrs-Winn as the
 
 trustee
 
 to hold progress payments “in Trust for the benefit of those furnishing work, labor, materials, services, equipment, etc.” Third, the progress payment to Marrs-Winn constituted an identifiable
 
 res
 
 because it was a sum “tentatively earned by Subcontractor [Marrs-Winn] by the partial or complete performance of the Subcontract Work.” Lastly, Alberici
 
 delivered
 
 this
 
 res
 
 to Marrs-Winn when an employee of Alberici (Terry Purs-ley) issued the $112,462.61 progress payment check to Charles Currie, the President of Marrs-Winn.
 

 The $99,000 in payroll monies similarly comprised trust proceeds under Missouri law. First, Marrs-Winn’s project employees and others who were entitled to receive payroll-related expenses were
 
 beneficiaries
 
 under subparagraph 2.5 — they “fumish[ed] work ... [or] labor ... to or through Subcontractor [Marrs-Winn] for the Subcontract Work.” Second, subparagraph 2.5 declared Marrs-Winn the
 
 trustee
 
 responsible for holding these funds in trust for the workers. Moreover, Exhibit G to the Subcontract plainly contemplated Marrs-Winn’s duties as trustee of the payroll funds in its detailed plan for administering those funds via the special payroll account. Third, the monies Alberici wire transferred into the special payroll account constituted the
 
 identifiable trust res.
 
 Finally, the trust corpus was
 
 delivered
 
 into the special payroll account in early December 1993 when Alberici wire transferred $79,610.67 for payroll purposes- and on prior occasions when Alberici made wire transfers into that account for payroll-related purposes.
 

 As the foregoing analyses show, sub-paragraph 2.5 of Subcontract Exhibit A set up an express trust arrangement between Marrs-Winn and the various trust beneficiaries. The $211,462.61 ($112,462.61 plus $99,-000) that Giberson surreptitiously transferred to its own bank account were clearly trust proceeds. Because Marrs-Winn did not have an equitable interest in these funds by virtue of its duties as trustee, Giberson did not have a right to these proceeds under its priority security interest.
 

 Giberson urges this court to find that the trust language in the Subcontract did not create a trust. It cites
 
 In re Lord’s, Inc.,
 
 356 F.2d 456 (7th Cir.1965), for the proposition that the “use of words of trusteeship is not conclusive as to the expression of an intent to have a trust, where incidents foreign to that relationship appear to have been contemplated.”
 
 Id.
 
 at 458. In Lord’s, this court held that a contract between a lessor and lessee did not create the intended trust noting that the relationship between the parties was merely that of a debtor and creditor.
 
 Id.
 
 at 459. The key factor in the decision was that the contract expressly permitted the debtor to commingle the purported trust funds with its general funds.
 
 Id.
 
 at 458-59.
 

 In this case, however, Marrs-Winn and Alberici did not enter such a self-contradictory agreement. The Subcontract neither discusses nor contemplates the commingling of any general funds with the trust funds held for the benefit of Marrs-Winn’s laborers and materialmen. Moreover, there is no evidence that Marrs-Winn commingled any of its general funds with the trust funds. The funds placed into the Magna Account consisted of monies wire-transferred by Alberici specifically designated for Marrs-Winn’s payroll-related purposes.
 
 [4]
 
 Giberson — not
 
 *593
 
 Marrs-Winn or Alberici — deposited the progress payment check into the Magna Account. Once Alberici learned of this deposit and of Giberson’s subsequent transfer of the progress payment to Giberson’s own account, Alberici wrote Giberson insisting that the funds be returned to Marrs-Winn and that Giberson not commingle them with Giber-son’s own monies. Any commingling that did occur was a result of Giberson’s own actions.
 

 Giberson also asserts that Marrs-Winn’s attempt to “return” $50,000 of the progress payment to Alberici in order to pay part of the “backcharge” demonstrates that the Marrs-Winn/Alberici relationship was closer to that of a debtor and creditor than of a trustee and beneficiary. Giberson, however, overlooks the fact that the $50,000 payment to Alberici was an installment payment to compensate Alberici for furnishing labor, work, materials, services, and equipment to Marrs-Winn when Marrs-Winn was unable to perform the Subcontract. Moreover, the mere fact that Marrs-Winn and Alberici had a contractor/ subcontractor relationship does not prohibit them from having a trustee/beneficiary relationship.
 
 See, e.g., In re Mastercraft Metals, Inc.,
 
 114 B.R. 188 (Bankr.W.D.Mo.1990).
 

 Two other cases relied upon by Giberson—
 
 Capitol Indemnity Corp. v. United States,
 
 41 F.3d 320 (7th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 2581, 132 L.Ed.2d 831 (1995) and
 
 National Surety Corp. v. Fisher,
 
 317 S.W.2d 334 (Mo.1958) — are similarly inapplicable here. In
 
 Capitol Indemnity,
 
 this court allowed the IRS to attach a tax lien upon a contractor’s progress payment after determining that the contractor did not hold these funds in trust for its subcontractors or its surety. 41 F.3d at 323-26. We found the contract’s “trust” language to be mere “boilerplate” because it manifested no intent to create a trust, nor did it establish a discrete trust corpus.
 
 Id.
 
 at 324. The case, however, did not turn on this “boilerplate” characterization; rather, another part of the contract detañed the subcontractor’s lack of rights in the progress payment.
 
 Id.
 
 That section of the contract provided that “[n]either the Owner nor the Architect shall have any obligation to pay or to see to the payment of any moneys to any Subcontractors except as may otherwise be required by law.”
 
 [5]
 

 Id.
 

 In contrast to the contract in
 
 Capitol Indemnity,
 
 subparagraph 2.5 of Subcontract Exhibit A expressly provided that the progress payment and the payroll monies were never the property of Marrs-Winn: “Such tentative earnings shall not be due or payable to Subcontractor or anyone else claiming in Subcontractor’s place and stead ... until and unless such Subcontract Work is fully and satisfactorily completed, all Subcontract requirements are fulfilled, [and] Contractor and such persons are fully paid and satisfied-” This provision, as well as Subcontract Exhibit G, much more clearly designated the progress payment and the payroll monies as trust funds than did the contract in
 
 Capitol Indemnity.
 

 Giberson’s reliance on
 
 Fisher
 
 is sinularly without merit. In
 
 Fisher,
 
 two competing sureties sought rights in a progress payment made to a general contractor.
 
 Fisher,
 
 317 S.W.2d at 336. One surety put forth an “equitable lien” theory, claiming a proprietary interest in a progress payment that had been made to the general contractor.
 
 Id.
 
 The Supreme Court of Missouri rejected this concept relying on a line of cases holding that “money paid to the contractor, for work accomplished, and
 
 without restrictions,
 
 becomes his money to do with as he pleases, and that to fetter such funds with hidden liens or incumbrances would be an unwarranted restriction upon commercial business.”
 
 Id.
 
 at 342 (emphasis added).
 
 Fisher
 
 is distinguishable considering that the Marrs-Winn/Alberici Subcontract
 
 expressly imposed restrictions
 
 on Marrs-Winn’s proprietary interest in the progress payment and the payroll monies.
 

 
 *594
 
 3.
 
 Giberson
 
 Was
 
 Not a Beneficiary of the Trust.
 

 Giberson also asserts that even if the Subcontract established a trust arrangement, Giberson was a beneficiary of that trust. The BLSA included a clause in which Marrs-Winn agreed to pay Giberson up to $400,000 in exchange for Giberson’s expertise, skill, and advice in helping Marrs-Winn perform the Subcontract. Giberson claims that this arrangement made it a beneficiary of the trust because it “furnish[ed] ... services ... to or through Subcontractor for the Subcontract Work.”
 

 Both the bankruptcy court and the district court rejected this argument, reasoning that subparagraph 2.5, when read in its entirety, contemplated that the trust was created for the benefit of those having liens or bond claims based on the labor it performed or the materials it supplied. The work contemplated by the Subcontract involved providing and installing reinforcing steel and post-tension-ing cable on the stadium. As the district court noted, “Giberson’s claim for consulting fees hardly seems to fit within these provisions.”
 
 In re Marrs-Winn, Co.,
 
 193 B.R. at 498. Although the last sentence of subpara-graph 2.5 arguably permits a broad class of trust beneficiaries, we agree with the courts below that the sentence must be read in conjunction with the rest of subparagraph 2.5. In that regard, the trust funds were earmarked for (1) full and timely completion of the Subcontract work and requirements; (2) the payment of “backcharges” and “claims” due to Alberici from Marrs-Winn based on the Subcontract; and (3) the payment of subcontractors, workers, design professionals, material or service suppliers, and others having valid and enforceable mechanic lien claims or bond claims.
 

 Giberson’s “services” do not fit neatly into any of the above categories. In this regard, we find the following sentiments of the bankruptcy court most persuasive:
 

 [Tjhere is no evidence of any financial services by Giberson for the benefit of the Debtor; financial disservices would be a more accurate description of Giberson’s actions. While supposedly serving as the Debtor’s financial advisor, Giberson unilaterally seized funds intended for payroll and other legitimate debts, and thereby prevented the Debtor from meeting its obligations and causing Alberici to declare the Debtor in default. These actions were clearly contrary to Giberson’s obligation under the Loan Agreement to make available to the Debtor “Giberson’s expertise, skills, and advice in assisting” the Debtor’s performance of the Subcontract.
 

 Opinion,
 
 In re Marrs-Winn Co., Inc.,
 
 203 B.R. 964, 971-72 (Bankr.C.D.Ill.1995).
 

 Finally, at the hearing on the BLSA, the bankruptcy court indicated that it would closely scrutinize any request made by Gi-berson for payment of its consulting fees. By unilaterally seizing the Magna Account funds without giving notice to anyone, Giber-son did not follow the bankruptcy court’s mandate. As such, even if Giberson was entitled to certain funds as a beneficiary of the Subcontract, it clearly was not permitted to unilaterally convert all of the trust funds for its own use. Considering all of the factors above, we easily find no merit in Giber-son’s argument that it was entitled to the $211,462.61 as a beneficiary of the trust.
 

 C.
 
 The Business Loan Security Agreement and the Financing Order
 

 In light of our determination that Giberson wrongfully seized trust funds from the Magna Account, we need not belabor Giberson’s argument that the Financing Order expressly authorized Giberson to seize these funds. The seized funds were trust funds and thus, they were not part of Marrs-Winn’s bankruptcy estate. As such, these funds were exempt from Giberson’s first priority security interest.
 

 Giberson relies on
 
 Kham & Nate’s Shoes No. 2, Inc. v. First Bank of Whiting,
 
 908 F.2d 1351 (7th Cir.1990), in asserting that it was denied the benefit of the Financing Order. In
 
 Kham & Nate’s Shoes,
 
 we held that a bankruptcy court could not “undo the priority granted by a financing order without first finding that the creditor acted in bad faith.”
 
 Id.
 
 at 1355. Giberson argues that the bankruptcy court should have enforced
 
 *595
 
 the Financing Order because “a lender that extends credit in reliance on a financing order is entitled to the benefit of that order, even if it turns out to be legally or factually erroneous.”
 
 Id.
 

 We
 
 wholeheartedly agree with Giberson that a creditor must be able to rely on a bankruptcy court’s financing order. But in this case, the Financing Order cannot change the “trust fund” status of the monies in the Magna Account. As outlined in great detail above, these funds came into Marrs-Winn’s bankruptcy estate subject to the claims of the trust beneficiaries; Giberson was not such a beneficiary. Giberson could not divest the beneficiaries of their equitable interest in the trust funds by surreptitiously transferring the monies to its own private account. Such action was certainly not authorized by the Financing Order.
 
 [6]
 

 When read in conjunction, the Financing Order, the BLSA, and the Subcontract do not do violence to each another. Giberson asserted that the Financing Order should take priority over the Subcontract because Alberiei signed the Subcontract after the bankruptcy court entered the Financing Order. Giberson, however, was well aware of the Subcontract when it entered into the BLSA. The loan agreement itself makes several references to the Subcontract — the very purpose of the BLSA was to allow Marrs-Winn to effectively perform the Subcontract. An obvious requirement of performing the Subcontract was paying employees and mate-rialmen for their labor and supplies.
 

 Moreover, the Financing Order provided that Giberson could “apply post-Chapter 11 accounts receivable and the proceeds thereof’ against Marrs-Winn’s debt. At the time Giberson seized the trust funds, those monies were neither accounts receivable nor proceeds. They were sums “tentatively earned” by Marrs-Winn as provided by subparagraph 2.5 of Subcontract Exhibit A. Those tentative earnings were clearly subject to the trust arrangement set out in the Subcontract. As such, the bankruptcy court-the tribunal best able to interpret its own orders,
 
 see In re Chicago, Rock Island & Pac. R.R.,
 
 860 F.2d 267, 272 (7th Cir.1988) — did not deny Giber-son the benefit of the Financing Order in finding that the Order did not trump the Subcontract.
 

 Finally, the rationale of
 
 Kham & Nate’s Shoes
 
 does not apply when the lender and debtor ignore the due process rights of third parties.
 
 See In re Tek-Aids Indus., Inc.,
 
 145 B.R. 253, 258-59 (Bankr.N.D.Ill.1992). In this case, the lender (Giberson) plainly ignored the due process rights of third parties (the trust beneficiaries) when it unilaterally seized the trust funds without notice to Marrs-Winn or the beneficiaries.
 

 The decision of the district court is hereby Affirmed.
 

 [1]
 

 . Marrs-Winn filed for protection under Chapter 11 of the Bankruptcy Code. Marrs-Winn’s case was converted to a Chapter 7 proceeding after Bankruptcy Judge Larry Lessen entered his order in favor of Alberici and Marrs-Winn. Neither Marrs-Winn nor the bankruptcy Trustee filed a brief in this appeal.
 

 [2]
 

 . The Subcontract apparently contemplated that two accounts would be set up for payroll and payroll related expenses: one for the payroll and one for the payroll taxes and fringe benefits. The latter account, however, was either never opened or never utilized. The record reveals that only a single Marrs-Winn account was established at the Magna Bank, and thus, this opinion will refer to that single account as the Magna Account.
 

 [3]
 

 . There is some discrepancy in the parties' briefs and the opinions below regarding the exact amount Giberson seized from the Magna Account. From our review of the record, it appears that Giberson actually took possession of $211,462.61, not $211,452.61. (R. at 402, 405 & .409.)
 

 [4]
 

 . At the hearing before the bankruptcy court, an Alberici employee testified that Alberici made two or three "petty cash transfers]” into the Magna Account to “pay for some miscellaneous items” and to keep the account a positive figure. (Hearing Tr. at 82.) MaiTS-Winn maintained
 
 *593
 
 that only payroll and payroll-related expenses went into the Magna Account, (Hearing Tr. at 89), and Giberson provided no evidence that the "petty cash transfer[s]” were not intended for payroll-related expenses.
 

 [5]
 

 . The
 
 Capitol Indemnity
 
 court also determined that the subcontractors could not claim property rights in the progress payments under state law (the Illinois Mechanics Lien Act), under an equitable lien theory, under an implied trust, or as a third-party beneficiary. 41 F.3d at 324-25.
 

 [6]
 

 . In their briefs and at oral argument, the parties disputed whether the Magna Account was the "lockbox" account contemplated by the Financing Order. Giberson's entire argument rests on the premise that these funds came from the “lockbox" account because the Financing Order permitted Giberson to "withdraw all remittances made to the lock boxes and ... apply the proceeds of said remittances to the indebtedness due to it from the Debtor [Marrs-Winn]." The deposition testimony of Giberson's president, however, reveals that Giberson was well aware that the Magna Account was used to pay payroll and payroll-related expenses. (Giberson Dep. at pp. 33-36.)
 

 Moreover, Phillip Giberson's July 31, 1993 letter to Alberiei contemplated a procedure for Marrs-Winn to pay its laborers and materialmen that mirrored both Subcontract Exhibit G and BLSA paragraphs 5.4 and 5.5 (the "lockbox" provisions): “All monies paid Marrs-Winn on the project would be deposited into an account acceptable to J.S. Alberiei and Giberson Electric. Paychecks, union benefit checks, and tax deposits would be written with dual signatures, Charles' [Currie — the President of Marrs-Winn] and mine.” (R. at 372.)